All right, thank you. You can be seated. Mr. Sweeney, I appreciate your eagerness. May it please the court. Yes, sir. I am eager. I am here representing Stephen Kolbe, a Maryland family man and small business owner, as well as Andrew Turner, a Navy veteran master-at-arms, as well as Maryland's citizens' rights groups and businesses. The plaintiffs have standing, and there's no dispute of that, to bring a facial challenge on behalf of responsible, law-abiding Maryland citizens to bans that deny them the right to have in their home popular semi-automatic rifles and standard-capacity magazines. These protected arms cannot be banned from the home. That's the lesson of Heller. And I am humbled to speak to this panel about what Heller teaches, since each of you has authored that. But I submit this case presents, for the first time in this circuit, a more close fit to Heller than any of the other situations in which you've had to apply Heller, because this is the first case in which this circuit has actually been asked to apply to a ban on protected firearms in the home. So under Heller, the only question that's asked is whether banned firearms are commonly kept for lawful purposes in the home by law-abiding, responsible citizens. If they are, they can't be banned. They're protected under the Second Amendment. If they're not, then they're not protected. So that's different from what we've referred to as the first prong under Chester as to whether or not the firearm or the activity in question is within the scope of the Second Amendment? This court in Chester, as well as some of its other cases, set out what the Second Amendment protects. And the scope of the Second Amendment extends to, as this court said in Chester, weapons typically possessed by law-abiding citizens for lawful purposes. So if these firearms are typically possessed by law-abiding citizens for lawful purposes, and there is no serious dispute that they are, and no court that has addressed a similar ban or the court below has found the contrary, then they're protected by the Second Amendment. And the Heller court makes clear that's the end of the analysis. You cannot ban them. That was the categorical test of Heller. Can you regulate them? Restrictions short of bans may be permitted. And then I submit you may want to look at the test that you have in Chester and some of the other cases in this circuit for that purpose. But an outright ban is precluded by the Heller case. It's important to remember what was involved in Heller. It was a total ban on possession of handguns, as well as a ban on any operable firearm in the home. Trigger locks were required. Now, both those bans were struck down. The state, the District of Columbia, in the Heller case said, wait, wait, wait, wait, wait. We're not going to apply the ban on operable firearms to long guns. So you don't have to overturn the ban on handguns. You can use operable long guns in the home. The Supreme Court said, no, no, no, no, no. That doesn't save the handgun ban. Nor did allowing handguns save the ban on having operable long guns in the home. Why? Because both long guns and handguns are typically possessed in the home by law-abiding citizens. How would you articulate the principle or set the test for other cases besides this on when you have a ban? For example, let's say with the magazines here. There's evidence there are 75 million or so around. But let's say that there were only 75,000. Would that be a common firearm in use? Would that be subject to a ban? Your Honor, the question of commonality is one that was not closely addressed by the Supreme Court in Heller because it found no need. There's a lot of things they didn't thoroughly address. It found no need to. This case, we believe the evidence is clear when millions of Americans choose semi-automatic rifles and choose handguns and semi-automatic rifles with magazines with a standard capacity above 10, usually in the 10 to 20 range. Does this apply to any automatic rifles? Automatic rifles? Automatic rifles are not subject to this ban because they're already prohibited. Prohibited by the federal code. National Firearms Act. But the statute, Maryland statute talks about AK-47s in all forms. Correct, it does. It doesn't say in semi-automatic form. Its ban is redundant of the federal ban in that regard. Well, let me take you back. I'm sorry, go ahead. No, I understand. If the evidence was as to the large capacity magazines, there were only 75,000 in the United States, not 75 million. What would your analysis be? My analysis would be that they're not shown to be common in the sense that they're not common in the United States. The test here is commonly owned, typically possessed. It's simple. It's not numeric, although there will be accounting involved in it. If the F-150 is the most commonly sold vehicle in the United States, and twice as many of these firearms are sold in 2012 as the F-150, then they're common. It's simple. Well, how do you, it may seem simple on that example, but you have to come up with a principle to apply. In a legal opinion, it's going to be applied in other circumstances. So if you have, as you look at it, a ceiling, 75 million means that you're basically per se protected under the second method. But 75,000, you're not. How does a court differentiate in that gap on when there's, in effect, an automatic Second Amendment application? I can't help the court with that, other than to say it's not necessary for this case. In this case... So you're sort of like the Supreme Court to help. I'm going to accept that as a compliment under the circumstances, Your Honor. If you look for a moment at what Heller did say in this regard, it said a militia muster would require able-bodied men to appear with the firearms they typically possessed at home. And if you were to have a hypothetical militia muster in the green in Towson, Maryland, you would see the banned firearms in magazines appear in the arms of the able-bodied people of that community because they keep them at home. That's the test the Supreme Court applied in Heller. That's the test that you must apply in this case. It's a simple one. And the Supreme Court twice said, once in Heller and once in McDonald, to the dissent, you're making this too hard. We're not asking Judge to do all these fine questions about numerosity and how many is enough. You know common when you see it. These are common. Is that sort of like the Justice Potter test on hardcore pornography? It is indeed, Your Honor. This may be one of the great mysteries in this area, but if the test is as you say it is, why didn't the Supreme Court just say that clearly instead of leaving all these unsettled questions? It took out rational basis review and then it says under any standard of scrutiny, the DC ban is going to fail. But it kind of leaves us hanging as appellate courts around the country and district courts as to know what we're supposed to do there. It sort of seems like they would have said, you just don't have to fool with standards of scrutiny if this was going to be your test. And that's what the court did in Heller. It didn't fool with standards of scrutiny. It said an absolute ban on a firearm typically possessed for lawful purposes cannot stand under any level of scrutiny. Now, there is a question about whether any level of scrutiny… They haven't said these are military weapons. They're wrong. They're not military weapons? They are not. Well, they're weapons that infantrymen for various armies around the world generally carry. That's not true. It's not true. No. AK-47s and M-16s. AK-47, the fully automatic version, is, Your Honor. Well, but they're not a fully automatic version. They can go back and forth. The critical distinction, and I don't blame Your Honor for asking the question because the state has blurred the line between automatic and semi-automatic firearms. That is clear as day. There is a critical… The state has blurred it, you're saying? The state has indeed. And let me tell you how, in two ways. First, they say these prohibited firearms, which are the civilian version of military firearms, not military firearms. And the critical distinction is automatic versus semi-automatic fire. A critical distinction that's carried in the National Firearms Act in defining machine guns. A critical distinction which the Supreme Court addressed in the Staples case. The National Firearms Act, is that the one, 1934? It is indeed. A critical distinction that the Supreme Court addressed in the Staples case. What did Staples involve? A conviction of the owner of an AR-15. Under the National Firearms Act, because it had been converted to automatic fire. Unbeknownst to the owner. There was no evidence he knew it was capable of automatic fire. The government said, he's got an automatic weapon. He's going down under the NFA. Supreme Court said, not so fast. He didn't know it. And the AR-15, the civilian version of the M16, is not known to be automatic. And such firearms are among firearms that are traditionally considered to be lawful possessions in the United States of America. So without a specific scienter of the automatic capability of that firearm, he could not be convicted under the NFA. There is a bright line here. And when the Supreme Court and Heller referred to, well, we assume that the NFA's regulation of the M16 would be upheld. They assumed that. It's referring very specifically to the M16, not its civilian semi-automatic version. There was a lot of evidence here about how fast you could fire the semi-automatic compared to the automatic. The evidence in the record relied upon by the state and relied upon by the court is the testimony by a paid lobbyist for the Brady Group before Congress. The man is not an expert in firearms. He's now a realtor in Virginia. That's what that is based on. There is a difference, a critical difference, between the rate of fire for automatic and the rate of fire for semi-automatic. The line is bright. The definition has stood the test of time under the NFA. The Supreme Court and Heller in talking about the M16 simply reinforced that bright line. We have popular firearms millions of people have flocked to own because they choose them for lawful purposes. They have voted, and that's the test under Heller, the popular choice of the people. These are not military weapons, even though they may look like military weapons. What are they used for? They're used for target practice. They're used for self-defense. They're used for hunting. The AR-15 and the semi-automatic version, the AK-47, are the most popular firearms in Maryland, the state admits. They're frequently used at competitions throughout the state at gun ranges, often compromising most of the firearms that are being used. The firearms that have been prohibited are virtually all of the semi-automatic rifles. The state's essentially saying we can draw the line differently than where the Congress drew the line, than where the Supreme Court drew the line. We can draw it at a place where we say the firearms are, and now let's make up a test, unusually dangerous, or sometimes they say unreasonably dangerous, or sometimes they say particularly dangerous. The point is, the test is not any of those. The test is typically possessed by law-abiding citizens for lawful purposes. That's the test. Are you saying that there's no level of scrutiny applicable to this? I am, absolutely, under the Supreme Court's case in Heller. If this court— I was going to say, let's just assume for the purposes of argument. Having looked at all these post-Heller cases from the various circuit courts of appeal around the country, all of them, I think, unless you can give us one that isn't, have looked at firearm-related provisions post-Heller using some form of scrutiny, strict scrutiny, intermediate. If, assuming for purposes of argument, we decided that your formulation for Second Amendment, I'll call it per se, protection, if we didn't accept that and we moved to a scrutiny-based system, what's your best argument there? It's a simple argument. This court set out the test in Mascindaro that built upon Chief Judge Traxler's opinion in Chester with respect to the firearms in question. The state has not even attempted to meet this test. The court said, as we observe that any law regulating the content of speech is subject to strict scrutiny, we assume that any law that would burden the fundamental core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny. And what does that mean? How does that play out here? The bans are not narrowly tailored to achieve a compelling state interest. The bans are not the least restrictive alternative. There are two less restrictive alternatives in place that the state abandoned when they put these restrictions in place. First, they've been regulating the semi-automatic rifles they now ban since 1994, requiring registration and an enhanced approval. And since 1994, they've had a 20-round cap on magazines. So we're not talking about the difference between 10 and 50 or 10 and 100. We're talking about the difference between 10 and 20, which is the range in which the majority of handguns and semi-automatic rifles are produced with standard magazine capacities, 15, 17, 19. That's where most of the modern firearms come in. And they've been permitted under the cap at 20. Abandoning those, they can't possibly justify without saying, what we really want to do is ban protected arms. And that's what this is about. I see my time is up. Okay, thank you. Let's hear from Mr. Bader. Thank you. May it please the Court, together with Attorney General Brian Frosch, we represent the defendants' appellees in this case. The issue before this Court is whether the state of Maryland is precluded by the Second Amendment from banning certain firearms, not an entire class of firearms, certain firearms and magazines that are both particularly dangerous and not particularly useful for self-defense, while leaving unaffected the vast majority of firearms, including all of the firearms that the Supreme Court identified as those overwhelmingly chosen by Americans for self-defense. Based on the Second Amendment jurisdiction... How about the large capacity magazine? If they're right, there's 75 million out of them. 75 million of those around, that would seem to be pretty common. And we have not claimed that the large capacity magazines themselves are not common, but that is not the end-all, be-all of this test. The Heller Court most definitively did not say that anything common does not get subjected to any standard of scrutiny. In discussing the Miller case and presumptively lawful regulations and the scope of the Second Amendment, that court identified weapons in common use at the time as something that its earlier decisions had said fell within the protection of the Second Amendment. Not that there was an inability to ban them, but that those fell within the protection of the Second Amendment. This court and almost every other circuit court and federal court at all to have looked at Second Amendment questions post-Heller has said that's the first step of the process. Does this fall within the scope of the protection of the Second Amendment? If it does, then you proceed to apply the applicable level of scrutiny. So commonness does not at all resolve the question. In the Heller case itself, the Supreme Court said, here we're dealing with the entire class of handguns, what it called the quintessential self-defense weapon, the weapon overwhelmingly chosen by Americans for self-defense, which the Supreme Court identified as the core basis for the Second Amendment right. In that context, dealing with that entire class of weapons overwhelmingly chosen for self-defense, the court said there's no standard of scrutiny that a complete ban on those firearms could meet. The Supreme Court never said anything resembling Mr. Sweeney's argument that any time there's a commonly owned weapon, it's exempt from any standard of scrutiny. But you have a complete ban here, at least for a magazine with more than 10 shots. There is, Your Honor. And it's for a magazine that can hold more than 10 rounds. It is not necessary at all for self-defense, unlike, of course, the weapon involved in Heller, which was the quintessential self-defense weapon. That's a proven fact, not subject to dispute. That it's not necessary for self-defense? I certainly do. I think it's undisputed on this record where there's evidence that chief law enforcement officers in Maryland couldn't find a single incident in which more than 10 rounds were necessary to be fired in self-defense in Maryland, and the plaintiffs didn't come up with one either. There is no—and there are— Why isn't it responsible? Well, it certainly goes to the issue of whether these are— it goes to the narrow tailoring. It goes to the test under intermediate scrutiny or, frankly, strict scrutiny either, of whether this ban addresses or impacts the core Second Amendment right. And since the Second Amendment right is geared toward self-defense, the fact that these firearms and these— That's not what the Supreme Court said in Heller. It said in Heller, for lawful purposes such as self-defense. And opposing counsel has indicated that that also includes hunting, target shooting, competitive shooting, collecting. All those are lawful purposes. The Supreme Court was talking in Heller about the scope of the Second Amendment's protection, not the application of the applicable level of scrutiny. And in talking about the purposes for which the Second Amendment was ratified at the founding, it discussed only—it discussed three purposes. Militia, the purpose for which it was—the right was codified in the Constitution, but which the Supreme Court said was not the primary purpose for the right. It defined that as self-defense. And it also mentioned the possibility of hunting, that some people may have thought the right was equally important for hunting. When discussing the weapons that might fall within the scope of the Second Amendment's protection, and particularly its decision in Miller, there it engaged in the discussion of Miller's comment that the Second Amendment would not extend to weapons that were not commonly owned at the time. Miller based that distinction on its conception that the Second Amendment was grounded in a militia-based purpose. That was Miller's distinction. What would you bring out to a militia muster? Well, it would only be weapons in common use at the time, so weapons that aren't in common use wouldn't be protected at all. The Heller Court did not find that same rationale to support that right. Heller found that rationale for Miller to be a limitation on the right, not based on the militia-based distinction, but based on the historical prohibition of carry of dangerous and unreasonable weapons, which dates back to the 1394 Statute of Northampton in England. So it said we think that that distinction about common use is fairly supported, not by just because they're in common use, not by popularity, but based on the historical ability to prohibit dangerous and unusual weapons. If you defined unusual at the time of the founding, adoption of the Second Amendment, if you looked at Mr. Johnson's dictionary defining the term unusual, it would be defined as common or uncommon. And Blackstone's original phrase for that term was dangerous or unusual. This is dangerous and unusual. I don't think that either one goes to just simply deciding what numbers we should count, we can count to. And in fact, with respect to the assault weapons, we don't think that they're commonly owned. The statistics that were provided even under the plaintiff's count as far as how many of them were there would indicate that fewer than 1% of Americans actually own one of the assault weapons. How about the magazines? The magazines, more would be owned, but that only gets you to the point of then looking at it under the applicable level of scrutiny, which certainly for this case would be no greater than intermediate scrutiny. This court has not issued any investigation into the severity of the burden in determining what level of scrutiny to apply. In fact, in Chester, in Machidaro, in Carter, in Woolard, in every case where this court has looked at what level of scrutiny would apply, this court has said that it depends on the nature of the burden as well as the severity of the burden. In this case, the evidence is clear that if there is a burden at all on the Second Amendment right from either of these bands, it is minimal at best. Let me ask you this. Would you agree that a law-abiding citizen has a constitutional right to possess a semi-automatic pistol in their home for self-protection? I don't think the Supreme Court has gotten to the point of whether it's semi-automatic versus not, but certainly there's a right to possess an operative handgun in the home for self-protection, yes. So you would make a distinction between a right to have a semi-automatic pistol versus… I'm not sure I would, Your Honor. I've never considered that question of whether there's a distinction between semi-automatic and automatic, but the Supreme Court has certainly said you can't ban handguns in the home. So you're questioning then the constitutionality of a citizen's right to possess a semi-automatic pistol in their home for self-defense? I'm not raising that as a constitutional question, Your Honor. I don't think that's raised in this case. You're not answering my question. You're asking another question. My question is, in your opinion, does a law-abiding citizen have a constitutional right to possess in their home a semi-automatic pistol for their self-protection? I'm afraid, Your Honor, I haven't seen any case law that has resolved that issue. Clearly, there's a right to possess a handgun. Whether that's a right to possess a semi-automatic handgun, I haven't given consideration to that, and I don't think any court's opinion has answered that. So I'm curious, what kind of handgun do you think the Constitution allows a person to have in their home? Well, there are certainly other handguns that are not semi-automatic. Like what? I know a revolver, but it still pulls and shoots a bullet every time you pull the trigger. What else? It does, and I don't think that that is – if that is, then you're considered semi-automatic. So your standard Garden-Bride Smith & Wesson six-shot cylinder is a semi-automatic weapon? I'm sorry, Your Honor? Your standard Smith & Wesson six-shot revolver, is that a semi-automatic pistol? I suppose if the round is replaced in the chamber after each pull, so that you pull after you trigger, then yes. And I think that it's the case. Can a law-abiding citizen possess that revolver in their home? Yes, Your Honor. So we've established the six-shot revolver is acceptable. How about a Glock with a 15-capacity magazine pistol? In my light state. I think that the state certainly has the right to restrict the size of the magazine, because all of the evidence is that more than 10 rounds are not necessary or not used in self-defense. So it is not affecting – a prohibition on magazines that can hold more than 10 rounds does not affect the self-defense aspect of that firearm. It does not affect its use in hunting. It is not a serious burden on any lawful use of that firearm. What if the magazine has a number of – permits a number of bullets you find acceptable? Is it then constitutionally possessed or does the person have the constitutional right to possess it? If it's the – that I personally find acceptable? No, it's a constitution. Well, you make a big deal about how many bullets it holds. Let's take that out of the question. Whatever amount suits you, you think is appropriate, this magazine allows that number of bullets. Now, can a person, law-abiding citizen, constitutionally possess that semi-automatic pistol with however many bullets, more than one, you would allow? Does the Constitution protect their right to hold that and possess that pistol? Yes, Your Honor, to possess an operable handgun, certainly. Here's my next question. What constitutional difference is there between a semi-automatic – and a legal possession of a semi-automatic rifle? What is the constant difference that the Constitution would recognize between those two weapons? And let me make sure the distinction is clear for this case because Maryland did not ban all semi-automatic rifles. Maryland banned particular semi-automatic rifles that are effectively the same, the only difference being automatic versus semi-automatic fire, as the firearms that are most used by militaries around the world. So this is not a complete prohibition on semi-automatic rifles. That would be a different case. But you also banned something that's called a salt pistol. And that's not being challenged by the plaintiffs in this case. That's not challenged here, but the statute that we're talking about includes that term, salt pistol. Yes, it does. And that's not being challenged here, right? I agree with that. Yes, Your Honor. I want to interject that. Go ahead. That ban goes back to 1994, and it has not been challenged in this case. It was not part of the Firearm Safety Act of 2013. It wasn't in the new statute. It wasn't added in the new statute. Correct. All right. So to go back to the question, is there – do you see a difference of constitutional dimension between possessing a semi-automatic pistol versus a semi-automatic rifle? I certainly do. Yes, Your Honor. And it starts with the distinction drawn in Heller, where the Heller court identified handguns as the weapon overwhelmingly chosen by Americans for self-defense. And that was the reason that the entire class of handguns could not be banned. By virtue of that distinction, no other firearm could occupy that same place as being overwhelmingly chosen for self-defense by Americans. And, in fact, the evidence in this case is that semi-automatic rifles are not used for self-defense. There's no indication that one has ever been used for self-defense in the state of Maryland. So the Constitution would only recognize the first choice but not the second choice. The Constitution clearly protects the weapon overwhelmingly chosen for self-defense. And I think that once we get beyond that, we – The Supreme Court seemed to reject that specific argument in Heller because the District of Columbia argued in that case converse of what you're arguing here. They argued, well, we can ban the pistols because you can still use long guns. And the Supreme Court very clearly said, no, that's not acceptable. But that's actually – it's not the same argument, Your Honor, because what the Supreme Court said – But unlike Heller, you get to keep the pistol. But in Heller, the court was very clear as to why it did that. The court said, you can't say that it's okay for somebody to use – that it's enough for somebody to be able to use a long gun when the handgun is the firearm overwhelmingly chosen by Americans for self-defense. Here, what the state of Maryland has banned are weapons that are not used for self-defense. And what they do have available that's unaffected by this law is the weapons that are overwhelmingly chosen by Americans for self-defense. It's a very significant difference. What makes these military weapons the ones that you've banned? You said you've only banned the long guns that are military style. Right. What makes them military style? These are – the evidence in this case reflects that – and just taking the AR-15 as an example, which is the weapon concentrated on – The AR-15 is a civilian version of the M16. Yes, and the AR-15 – it was actually called the AR-15 when it was in development. It was developed as a selective fire rifle for the military to meet military specifications with features that the military wanted. The military then adopted that firearm, renamed it the M16, and in order to have a market for the weapon in the civilian population, they made one change, which was to remove the capability for automatic fire from the weapon. In every other respect, it is identical to the M16, which is the weapon used by the military, and the evidence certainly shows that it's not just a paid lobbyist. It's the D.C. Circuit. It's one of their own witnesses who testified that an untrained individual could shoot six rounds in a second from an AR-15. You could empty a 30-round clip in five seconds with one of them, which is why the United States Congress and the D.C. Circuit and other courts who have looked at this have found the AR-15 essentially indistinguishable from the M16 when it comes to its dangerousness, when it comes to the lethality of the firearm. And in fact, the United States Army has found that even M16s are most effectively used for offensive military-style assaults in semi-automatic mode, and it has cautioned its troops to rarely use them in automatic mode because they're more effective even for military purposes. Well, they think they're more accurate, don't they? Absolutely, that they're more accurate, they're able to control the fire, so that the use of them that is the most dangerous, the most useful for military-style assaults, is effectively a weapon in an identical condition to the AR-15, and the same thing applies to the AK-47. The handgun is the weapon that's not only most common for self-defense purposes, but it's also the most common for criminal purposes, including those that are automatic discharge handguns. So if that were the case, wouldn't it be more logical to attempt to ban the automatic pistol as opposed to the semi-automatic rifle? I think you mean the semi-automatic. Automatic pistols would certainly be... I mean the semi-automatic pistol as opposed to the semi-automatic rifle. Well, certainly, Your Honor, there is a ban on assault pistols in the Maryland law, which is not being challenged here. The law leaves open the use of the vast majority of handguns, which are still out there. And, of course, the Supreme Court has said in Heller that you can't ban handguns. But these particularly dangerous firearms, created for military purposes with military features as... Why are these more dangerous than the semi-automatic pistol? I mean, there are plenty of these. Take the incident of Virginia Tech. That individual used a semi-automatic pistol. There's no doubt that semi-automatic pistols can be used for murders as well. But the evidence, as reflected in this record, is that when these assault weapons and large-capacity magazines are used in mass shooting incidents, they lead to more shots fired, more injuries, and more deaths than when they are not used. What did the guy have at the Sandy Hook School? He had an AR-15 with 30-round magazines. And, Your Honor, when he went into that second classroom and started shooting those children, he had to change his magazine once. And a bunch of children got out of the room when he did. He had to change his magazine after 30 rounds because that's the capacity of the magazine. If he'd had to change it after 10 rounds, a lot more of those kids might have gotten out of that room. He had an AR-15 with a 30-round magazine. The shooter in Aurora, Colorado, in the movie theater had an AR-15 with even higher-capacity magazines. The shooter in Tucson, Arizona, had a semi-automatic pistol but with 33-round magazines. And when he had to change his 33-round magazine, he got tackled by bystanders and had to stop shooting. The 13th round out of that magazine... Is that the one where the judge was shot? That's where he shot the judge, yes. The 13th round out of that magazine killed a 9-year-old girl. If he'd had to change his magazine earlier, there may have been a different result. Are there any weapons listed in the Maryland law that are not either automatic or semi-automatic? I don't believe there are, Your Honor. Now, some of them are automatic, right? In your law? May I answer, Your Honor? Sure. The AK-47, certainly in all forms, there are fully automatic forms of that, although I agree with Mr. Sweeney that those have already been covered by the National Firearms Act. Well, are they challenging? Maybe I should ask them, but do you understand they're challenging the automatic form of it, too, then? They're saying that the statute's unconstitutional. They are saying the statute's unconstitutional. I think they're challenging the entire assault weapons ban. Would that have any impact on the constitutionality of the Section 5845 of Title 26? I think there are arguments, would, Your Honor, although they have said that they're not challenging that. But among other things, the firearms that are at issue here are certainly vastly more dangerous than the machine guns that were at issue when the National Firearms Act was enacted. And, by the way, the number of firearms covered by the National Firearms Act at that time, relative to the overall number of firearms in existence at that time, I think would have exceeded the number of these assault weapons relative to the overall number of some 300 million firearms that are actually owned in this country. So I think that that would have implications for that, although they haven't raised those specifically here. So one more question. Let's just assume that we disagree with Mr. Sweeney's proposed, per se, Second Amendment test. We go back to some sort of scrutiny-based analysis. Why wouldn't you use strict scrutiny here, since this is a ban? I'd like help. I think, first, Your Honor, that using a level of scrutiny analysis is compelled by this Court's cases in Chester and Machindaro. Well, in all those cases, though, every single case that we've had from Chester on down, you either had an individual under 922G who was not a law-abiding, responsible citizen, or, in First Amendment terms, it was a time, place, and manner restriction for concealed carry, carry in a sensitive place like a park. You haven't had occasion to determine scrutiny under any other circumstance than those. That's true, Your Honor, although in all of those cases, the Court set forth a two-prong test. The first question is, does it implicate conduct protected by the Second Amendment? And the second part was, if it does, does it satisfy the applicable level of scrutiny? So I think this— That's where we are, the applicable level of scrutiny. Exactly. So it can't be a per se test. Under this Court's jurisprudence, you always proceed to that second test of, does it satisfy the applicable level of scrutiny? And the reason here why it would not be strict scrutiny is because when the Court has set out that test, which standard of scrutiny do we apply? The Court has said you look at the nature of the regulation, the nature of the burden, which asks the question, does it fit within the core of the Second Amendment protection or outside the core? And that's where that distinction that Your Honor was just referencing comes into play in each one. In each of those cases, they've said it doesn't affect the core right because either its only implication is for outside the home or we're dealing with a non-law-abiding individual. But the second part of that test of looking at what standard of scrutiny to apply, every time this Court has, in each case, in Chester and Machindaro, is what is the extent of the burden? This Court, in Chester and Machindaro, quoted the language from the Seventh Circus decision in Scoia in which it said that we apply that greater justification, strict scrutiny, for a severe burden on the core Second Amendment right. In this case, all of the evidence is that there is not a severe burden on the core Second Amendment right, even though this statute does reach into the home. The burden is not severe. In fact, at most, it's minimal because of the evidence that these weapons are not used for self-defense. These magazines are not needed for self-defense. As every Court that has looked at this has determined, intermediate scrutiny is the appropriate level because there is no significant impact on the core Second Amendment right of armed self-defense in the home. Thank you. Thank you. Thank you. Mr. Sweeney, you have some time remaining. Thank you, Your Honor. This Court's Second Amendment jurisprudence on standard of scrutiny is elegant in its simplicity. Imagine, if you will, a Venn diagram. We have two variables, responsible, law-abiding citizens in the home. If it impacts either group alone, this Court will apply intermediate scrutiny. If they're in the home but they're not responsible and law-abiding, intermediate scrutiny. If they're responsible and law-abiding but they're outside the home, intermediate scrutiny. Now, if they're neither responsible and law-abiding and it's not in the home, you might even drop down to rational review. And I think there's one case that said that. But significantly, if it's both responsible, law-abiding, and in the home, strict scrutiny applies. Nothing could be simpler. Nothing could be clearer. And all of your cases fall into that very simple pattern. So that's one thing. Clearing up what the State said about Miller, Miller made clear that a sawed-off shotgun is not part of the ordinary military equipment. The ordinary military equipment was what demolition members would bring, arms supplied by themselves and of the kind and common use at the time. There was nothing about dangerous and unusual in that test. And there was nothing about dangerous and unusual that was brought in by the Heller Court on that. The State concedes that choice is the key here. Choice, what people choose to use. There is no test on actual use. I don't have to shoot my gun out my window every day in order to prove I'm using it. I have purchased it in case I need to use it. And for whatever reason, millions of Americans have chosen these prohibited firearms. The survey data that we relied on and is undisputed in the record shows that thousands of them, when asked why they chose these firearms, listed as their number two important use, self-defense in the home. Thousands of people said that. It's the choice. It's the people's choice. The State has never seriously argued that it can meet this Court's strict scrutiny test. These bans are not reasonably adapted. The State, in its most recent filing with the Court under Rule 28J in response to the Reynolds case, revealed its true purpose. It said the prior regulations that it replaced, the 77-hour provision for registration of the now prohibited firearms and the 20-hour limit capacity, which, by the way, would have precluded all those high-capacity magazines and those incidents that the State just referred to, those prior regulations, the State says, did not sufficiently reduce the availability of these protected arms. They're going and they're collecting printing presses and computers from the home because they're more effective than handwritten messages. They are trying to reduce the instrumentalities necessary to exercise the right themselves. They're not saying that there's a compelling State interest somehow beyond that. They're saying our compelling interest is to reduce the number of protected arms in the State, and frankly, that's what they've set about doing with this law. Their tests, not particularly dangerous and not necessary for self-defense, can be found nowhere in this Court's jurisprudence or in the Supreme Court's jurisprudence because they don't exist. And their only purpose they bring them out is so that they can determine where the line is drawn, the clear line drawn over here by Congress and the Supreme Court between automatic and semi-automatic fire and the line they like to draw anywhere they want to. Because if it's semi-automatic rifles today, it's semi-automatic pistols tomorrow. And you did not hear the State disclaim that intent. Well, compared to them, nobody asked them to express an opinion on that. Only a handful of other jurisdictions have attempted to ban these firearms and magazines. All of those are up on various stages of challenge. Those courts all found that these firearms and magazines are commonly kept and that similar bans burden Second Amendment rights. Those courts all applied intermediate scrutiny to uphold the bans. They simply got it wrong. This case is different from that because this court requires, at a minimum, that it apply strict scrutiny because this ban restricts the fundamental core right in the home for responsible law-abiding citizens. This can't withstand the test of narrow tailoring because it has gone too far and it ignores the less restrictive, proven-to-be-effective restrictions that were already in place. Thank you very much. Thank you very much. We appreciate outstanding arguments on this important subject.
judges: William B. Traxler Jr., Robert B. King, G. Steven Agee